OPINION
{¶ 1} The uncontested facts of this case are as follows: Cheyenne Timberlake was born on November 22, 1995, to appellant Kawona Timberlake. When Cheyenne was about two years old, appellant threatened to hang Cheyenne from a tree if appellee, Marla Caldwell, did not agree to take care of him. Ms. Caldwell agreed, and appellant relinquished guardianship of Cheyenne to appellee. Thereafter, on September 23, 1999, Ms. Caldwell filed a complaint pursuant to R.C. 2151.04(C) asserting that Cheyenne was a dependent minor child, and Cheyenne was so adjudicated.
 {¶ 2} In August 1999, appellant moved the Franklin County Probate Court to terminate Caldwell's guardianship due to disagreements between Ms. Caldwell and appellant regarding appellant's visitation with Cheyenne. In response, Ms. Caldwell stated that appellant had moved to Akron without informing her, was consistently unavailable, and regularly returned Cheyenne to her prior to the end of appellant's scheduled visits. Ms. Caldwell moved the court to order an inspection of appellant's home and to grant Ms. Caldwell legal custody of Cheyenne.
 {¶ 3} On September 30, 1999, the magistrate assigned to this case issued an order granting Ms. Caldwell temporary custody of Cheyenne with protective supervision. Appellant was allowed supervised visitation with Cheyenne for a minimum of one hour per week. On December 21, 1999, a full hearing was conducted by the magistrate; however, appellant failed to appear, and the matter proceeded uncontested.
 {¶ 4} At the conclusion of the hearing, the magistrate concluded that it would not be in the child's best interest to place him in appellant's home. He also again found Cheyenne to be a dependent child and awarded legal custody to Ms. Caldwell. A case plan was filed with the court on January 6, 2000, which stated that the court's previously issued temporary custody order was terminated, and that permanent legal custody of Cheyenne was placed with Ms. Caldwell.
 {¶ 5} In November 2000, appellant again requested that she be awarded legal custody and visitation. This in turn led to another hearing, at which time the magistrate granted appellant visitation supervised by Franklin County Children Services ("FCCS"). The magistrate later, in March 2001, ordered mediation between appellant and Ms. Caldwell. The parties appeared to have reached an amicable agreement which was filed with the case plan and the magistrate's decision from the preceding hearing on May 16, 2001. The ultimate result was that Cheyenne was placed under court-ordered protective supervision, and custody remained with Ms. Caldwell. The magistrate also ordered appellant to engage in supervised visitation with her son, in appellant's home, for at least three hours each week.
 {¶ 6} On June 4, 2001, appellant filed another motion for change of custody, alleging that a significant change of circumstances had occurred since the May 16, 2001 hearing. Appellant's motion prompted another hearing, after which the magistrate dismissed appellant's motion for custody finding it to be without merit. At that time, FCCS moved the court to join the agency as a party to this matter. FCCS also asked the court to terminate appellant's visitation rights unless and until appellant submitted to a mental health evaluation. The agency based this request upon its observation of appellant's behavior during supervised visits with Cheyenne, in addition to appellant's threats toward caseworkers and Ms. Caldwell.
 {¶ 7} On August 20, 2001, appellant filed yet another motion seeking custody of Cheyenne. After a limited hearing held the same day, the magistrate terminated appellant's visitation pending a further hearing. On October 11, 2001, the magistrate issued a decision in which he ordered appellant to subject herself to a complete psychological examination. The matter again came before the magistrate for another full hearing on November 8, 2001, at which time Cheyenne was interviewed. At the conclusion of the hearing, the magistrate determined that appellant's voluntary decision to move to Akron, Ohio, in addition to her documented history of sporadic housing and lack of employment weighed heavily against awarding her custody. He also found that appellant had made little progress on the case plan. Accordingly, the magistrate terminated the involvement of FCCS as well as the court ordered protective service.
 {¶ 8} Appellant objected to this decision and recommendation arguing: (1) that the magistrate failed to set a one-year review date to review the custody issue; (2) that the magistrate failed to establish a visitation schedule; and (3) that the magistrate improperly recommended termination of court-ordered protective service. On July 12, 2002, the trial court issued a comprehensive decision, in which it reviewed in detail the history of this case. The court also addressed each of appellant's objections at length, overruling each. The trial court explained:
 {¶ 9} "In this instance, Cheyenne had been in the care of Ms. Caldwell for over four (4) years and was six (6) years old at the time of the magistrate's hearing. Ms. Timberlake [appellant] presented no evidence that any change had occurred in the circumstances of Cheyenne or Ms. Caldwell that were not present or unknown to the Court since the prior review of custody. Further, the Court agrees with the magistrate in that a modification or termination of the legal custody of Cheyenne would not serve Cheyenne's best interests. Regarding Ms. Timberlake's supervised visitation, the magistrate left the door open for the parties to work out the visitation issues among themselves and terminated FCCS's requirement to supervise the visitation. The Court finds that the magistrate did not err on this issue. Even where Ms. Timberlake may have had residual rights to visitation with Cheyenne, she has not shown she is sufficiently stable to warrant a finding that the continuing court ordered visitation for an indefinite amount of time would be in the best interests of Cheyenne. The record indicates Ms. Timberlake's housing, income and emotional state remain problematic. From February 1998 through February of 1999, Ms. Timberlake lived in Akron, Ohio with her ex-girlfriend April Henderson. * * * Ms. Timberlake testified that she was injured in her home in 1999, during a violent altercation with Ms. Henderson, in which Ms. Timberlake swung and cut her hand on the back window of her home. * * * Additionally, Ms. Timberlake testified that Ms. Henderson, who suffered from a mental disorder, attempted suicide three days after the incident. * * * After the altercation, Ms. Timberlake moved back to Columbus, Ohio. Ms. Timberlake testified that she moved into her mother's home * * * and lived with her for approximately six months, beginning in February of 1999. * * * Although, she contradicted her testimony by stating that she stayed with her mother through October 2000. * * * When questioned further, Ms. Timberlake disclosed she only periodically stayed with her mother, while she shared an apartment in Greenbriar with her ex-girlfriend Eisha Howell. * * * Ms. Timberlake maintained that she was in a transitional state and moved back in with her mother after not being able to get along with Ms. Howell. * * * In October of 2000, Ms. Timberlake moved into an apartment on Virginia Lee Court, but broke her one-year lease on the apartment. * * * Timberlake then moved into a two-bedroom apartment located on Golden Gate Square East, with her former lover, Connie Spencer. * * * The apartment * * * had a one-year lease, which began in March 2001. * * * However, Ms. Spencer was incarcerated for a parole violation on August 4, 2001. * * * Once Ms. Spencer was incarcerated, Ms. Timberlake decided to break her lease on the apartment she rented * * * as she chose not to pay the rent, and was evicted from the apartment the two women shared. * * * Sometime between December 11, 2001 and January of 2002, Ms. Timberlake moved to Akron, Ohio. * * *
 {¶ 10} "Ms. Timberlake's attempts to remain financially stable had also been unsuccessful. Ms. Timberlake testified that she received $550.00 of income monthly from Social Security. * * * As such, the only time Ms. Timberlake worked during the previous three years, was from September 2001 until she quit in November 2001. During that period, she worked for United Dairy Farmers. * * * Three years before, she worked for McDonald's for approximately three (3) weeks. * * * When questioned about her reasoning for not having ongoing employment, Ms. Timberlake indicated she planned to further her education and work on completing her compact disk (CD). * * * Ms. Timberlake additionally testified that at the time of trial, she was being financially supported by her girlfriend, Ms. Cook, even though Ms. Cook was unemployed and receiving social security. * * * When asked how she could assure the Court that she would maintain stable housing and income, all that Ms. Timberlake could assert were promises. * * *
 {¶ 11} "Ms. Timberlake also exhibited a pattern of using funds, to which she admitted in testimony she was not entitled. For example, Ms. Timberlake had been receiving Social Security disability income since 1995 for a mental disorder, related to depression and psychosis. * * * She indicated at the hearing that she continued to receive the income, even though she testified she no longer suffered from the disorder. * * * Ms. Timberlake's mother is blind and Ms. Timberlake also receives $161.00 of the $550.00 each month from the Social Security Administration, due to her mother's unemployment. * * * Even so, Ms. Timberlake testified that her mother is employed with Lowe's Catchers. * * * In addition to the income from Social Security, Ms. Timberlake claimed she received student loans from her enrollment in Columbus State College in September 2001 and was taking courses toward a psychology degree. * * * However, she was not enrolled in college at the time of the hearing, due to a car accident, but continued to receive student loans in the amount of $6,900 annually. * * *
 {¶ 12} "Substance abuse and Ms. Timberlake's psychological condition are also of continuing concern to the Court. According to her psychological report, Ms. Timberlake attempted suicide at the age of 18 and again in 1998. In 1999, Ms. Timberlake committed herself to Maryhaven Alcohol and Drug Addiction Treatment Center. However, she testified that against medical advice, she checked herself out of the program after three (3) days. * * * Ms. Timberlake also testified that she had abused marijuana as recently as two months prior to the magistrate's hearing. * * * Yet, she denied she had a drug problem. * * * According to her January 18, 2002 psychological examination, stipulated to by the parties, Ms. Timberlake has been diagnosed as having a bipolar disorder, with borderline personality traits. The evaluation also indicated Ms. Timberlake has abused marijuana and alcohol. * * *
 {¶ 13} "Ms. Timberlake now lives in Akron, Ohio. As she continues to maintain transient housing; to receive, under questionable circumstances, Social Security income as her primary source of income; to receive and use student loan income while not enrolled in college; and to suffer from psychological issues, the Court is not persuaded that Ms. Timberlake's failure to complete a drug and alcohol treatment program is her only impediment to reunification with Cheyenne. Based upon the evidence, the Court is doubtful that Ms. Timberlake's issues will be resolved in a mere four (4) to six (6) months. Therefore, the magistrate did not err in terminating the court ordered supervised visitation with Cheyenne or in finding that maintaining the order of legal custody was in the best interests of Cheyenne." (July 12, 2002 decision at 7-12.)
 {¶ 14} Although appellant does not challenge the trial court's decision to award custody of Cheyenne to Ms. Caldwell, she does raise the following assignment of error:
 {¶ 15} "The trial court erred in failing to establish a reunification plan for the mother, which should have included, at a minimum, a one-year review date on the legal custody pursuant to R.C. 2151.417(C), a reunification case plan with specific guidelines for the mother to follow, and a visitation schedule between the mother and child in the meantime."
 {¶ 16} Appellant's assignment of error actually raises three issues for review. In the first, appellant asserts that the trial court should have maintained or established a reunification plan.
 {¶ 17} Under Ohio law, case plans, otherwise known as reunification plans, are required only in cases in which public children services or a private child placing agency is providing services to the family. R.C. 2151.412 provides:
 {¶ 18} "(A) Each public children services agency and private child placing agency shall prepare and maintain a case plan for any child to whom the agency is providing services and to whom any of the following applies:
 {¶ 19} "(1) The agency filed a complaint pursuant to section 2151.27 of the Revised Code alleging that the child is an abused, neglected, or dependent child;
 {¶ 20} "(2) The agency has temporary or permanent custody of the child;
 {¶ 21} "(3) The child is living at home subject to an order for protective supervision;
 {¶ 22} "(4) The child is in a planned permanent living arrangement.
 {¶ 23} "Except as provided by division (A)(2) of section 5103.153
of the Revised Code, a private child placing agency providing services to a child who is the subject of a voluntary permanent custody surrender agreement entered into under division (B)(2) of section 5103.15 of the Revised Code is not required to prepare and maintain a case plan for that child." (Emphasis added.)
 {¶ 24} In this case, it is undisputed that FCCS is no longer involved in this matter and is no longer providing any services to appellant, Cheyenne, or Ms. Caldwell. Additionally, there is no other private entity providing services. More importantly, however, appellant does not challenge the trial court's order dismissing the involvement of FCCS in this matter.
 {¶ 25} Appellant provides this court with only one case, In re Wright (Jan. 31, 2002), Ross App. No. 01CA2627, in support of her proposition that the trial court was required to maintain a reunification plan. We have reviewed Wright carefully, and in that case the appellant appealed an order granting custody to the Ross County Children Services Agency after that agency removed all five of the appellant's children from the appellant's home, and filed a dependency complaint based on disciplinary problems the boys were experiencing at school, including a lack of supervision by the appellant, in addition to inadequate living conditions. Clearly, the Ross County Children Services Agency was actively involved in the case. However, appellant has not explained to this court, nor has the court found any language in the Wright opinion which demonstrates that the trial court in this case was legally required to continue the involvement of FCCS. Thus, we find that the trial court correctly interpreted Ohio law and properly concluded that a case plan was not warranted under the circumstances of this case.
 {¶ 26} The second issue we will address is appellant's contention that the trial court erred when it decided not to continue a supervised visitation schedule. A trial court's ruling upon visitation matters will be reversed only when it is verified that the court abused its discretion. The legal phrase "abuse of discretion" means much more than an error of law or judgment. Instead, a finding that a court has "abused its discretion" means that the judge's attitude is demonstrably unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When determining whether a lower court has abused its discretion, an appellate court may not merely substitute its judgment for that of the trial court on the basis that it disagrees with the trial court's judgment. Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619. In other words, if the appellant is unable to objectively demonstrate that the trial court abused its discretion, the judgment of that court will not be disturbed on appeal. Blakemore, supra.
 {¶ 27} Although there is no direct statutory mandate that R.C. 3109.051 be applied to juvenile court proceedings, the parties and the court agree that the factors set forth for consideration in that statute are a good guide in a case such as this. R.C. 3109.051(D) provides:
 {¶ 28} "In determining whether to grant parenting time to a parent pursuant to this section or section 3109.12 of the Revised Code or companionship or visitation rights to a grandparent, relative, or other person pursuant to this section or section 3109.11 or 3109.12 of the Revised Code, in establishing a specific parenting time or visitation schedule, and in determining other parenting time matters under this section or section 3109.12 of the Revised Code or visitation matters under this section or section 3109.11 or 3109.12 of the Revised Code, the court shall consider all of the following factors:
 {¶ 29} "(1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child;
 {¶ 30} "(2) The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;
 {¶ 31} "(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;
 {¶ 32} "(4) The age of the child;
 {¶ 33} "(5) The child's adjustment to home, school, and community;
 {¶ 34} "(6) If the court has interviewed the child in chambers, pursuant to division (C) of this section, regarding the wishes and concerns of the child as to parenting time by the parent who is not the residential parent or companionship or visitation by the grandparent, relative, or other person who requested companionship or visitation, as to a specific parenting time or visitation schedule, or as to other parenting time or visitation matters, the wishes and concerns of the child, as expressed to the court;
 {¶ 35} "(7) The health and safety of the child;
 {¶ 36} "(8) The amount of time that will be available for the child to spend with siblings;
 {¶ 37} "(9) The mental and physical health of all parties;
 {¶ 38} "(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;
 {¶ 39} "(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
 {¶ 40} "(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the person, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that the person has acted in a manner resulting in a child being an abused child or a neglected child;
 {¶ 41} "(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
 {¶ 42} "(14) Whether either parent has established a residence or is planning to establish a residence outside this state;
 {¶ 43} "(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;
 {¶ 44} "(16) Any other factor in the best interest of the child."
 {¶ 45} In her brief, appellant makes no meritorious attempt to demonstrate that the trial court's factual findings amounted to an abuse of discretion. Further, we have carefully reviewed those findings, comparing them to the criteria set forth above, and are confident that the trial court acted reasonably, and did not abuse its discretion when it concluded that a continuation of the case and visitation plan would be fruitless at this time.
 {¶ 46} Similar to the trial court, we find the following uncontested findings of fact to be of particular concern. According to her own testimony, appellant moves at least several times a year, at times breaking written leases and at other times being evicted. This certainly does not provide a stable living environment for a young child just entering grade school. Appellant also has essentially no work history and was not employed at the times of the numerous hearings held below. Thus, she appears to have no earned income to support either herself or Cheyenne. When questioned how she paid her bills, she answered that she depended upon others to pay them for her and that she receives Social Security benefits, to which she later admitted she was not entitled. Appellant also admitted that she received educational loan money, although she was not enrolled in any college or educational program. She also admitted to abusing alcohol, marijuana, and possibly other illegal drugs, although she denied having a drug or alcohol problem.
 {¶ 47} When questioned about her living arrangements, appellant testified that she lived with numerous lovers, many of whom would come and go as they pleased. In regard to some of these lovers, appellant admitted that domestic violence had occurred. Appellant also admitted that she had attempted suicide twice and that one of her lovers had attempted suicide on at least one occasion after an incident of domestic violence.
 {¶ 48} Notably, appellant admitted that she moved from Columbus to Akron, Ohio, to get away from the "stress" of dealing with this matter, although she testified that she had since returned prior to the time of the final hearing in this matter. The record also contained convincing evidence that appellant had been unable to make any meaningful progress on her case plans and that she had also threatened more than one caseworker with physical harm.
 {¶ 49} In its final decision, the trial court observed that Cheyenne had been cared for by Ms. Caldwell for the last four of his six years of life and was established in this relationship. Finally, the trial court noted that appellant and Ms. Caldwell had been unable to amicably work out a visitation schedule that appellant would adhere to. In light of these uncontested findings, we are unable to conclude that the trial court abused its discretion when it terminated appellant's visitation rights.
 {¶ 50} In her third and final issue presented for review, appellant challenges the trial court's refusal to hold at least an annual review hearing for cases in which it has awarded legal custody. We agree that the trial court erred in failing to order an annual review hearing. R.C. 2151.417(C) provides that:
 {¶ 51} "Any court that issues a dispositional order pursuant to section 2151.353, 2151.414, or 2151.415 of the Revised Code shall hold a review hearing one year after the earlier of the date on which the complaint in the case was filed or the child was first placed into shelter care to review the case plan prepared pursuant to section 2151.412
of the Revised Code and the child's placement or custody arrangement, to approve or review the permanency plan for the child, and to make changes to the case plan and placement or custody arrangement consistent with the permanency plan. The court shall schedule the review hearing at the time that it holds the dispositional hearing pursuant to section 2151.35 of the Revised Code.
 {¶ 52} "The court shall hold a similar review hearing no later than every twelve months after the initial review hearing until the child is adopted, returned to the parents, or the court otherwise terminates the child's placement or custody arrangement, except that the dispositional hearing held pursuant to section 2151.415 of the Revised Code shall take the place of the first review hearing to be held under this section. The court shall schedule each subsequent review hearing at the conclusion of the review hearing immediately preceding the review hearing to be scheduled."
 {¶ 53} If a court issues a dispositional order pursuant to R.C. 2151.353, 2151.414, or 2151.415, the court has continuing jurisdiction over the child as set forth in R.C. 2151.353(E)(1). As noted previously, the court adjudicated Cheyenne a dependent child and awarded legal custody to appellee Ms. Caldwell. In such a case, pursuant to R.C. 2151.417(C), the court "shall hold a * * * review hearing no later than every twelve months after the initial review hearing until the child is adopted, returned to the parents, or the court otherwise terminates the child's placement or custody arrangement."
 {¶ 54} Because the trial court did not set forth an annual review hearing, we must reverse this matter with instructions to the court to do so. Accordingly, appellant's assignment of error is sustained in part and overruled in part. The judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch is affirmed in part and reversed in part, and this cause is remanded to that court so that the court may act in accordance with the instructions set forth in this opinion and applicable law.
Judgment affirmed in part, reversed in part, and cause remanded with instructions
KLATT, J., concurs.